Nos. 23-15049, 23-15050, 23-15051 (consolidated)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

THERESA SWEET, et al.,

*Plaintiffs-Appellees*,

&

EVERGLADES COLLEGE, INC., LINCOLN EDUCATIONAL SERVICES
CORPORATION, and AMERICAN NATIONAL UNIVERSITY,

*Intervenors-Appellants*,

v.

MIGUEL CARDONA, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:19-cv-3674 | Hon. William H. Alsup

## JOINT MOTION FOR STAY PENDING APPEAL

Jesse Panuccio
Jason Hilborn
BOIES SCHILLER & FLEXNER LLP
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
(954) 356-0011
jpanuccio@bsfllp.com

*Counsel for Everglades College, Inc.*

Lucas C. Townsend
Jeffrey Liu
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
LTownsend@gibsondunn.com

James L. Zelenay, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7449

*Counsel for Lincoln Educational Services
Corp.*

***Additional Counsel Listed on Next Page***

John S. Moran
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
(202) 828-2817
jmoran@mcguirewoods.com

Piper A. Waldron
MCGUIREWOODS LLP
1800 Century Park East, 8th Floor
Los Angeles, CA 90067
(310) 315-8250

*Counsel for American National University*

Katherine Worden
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
(415) 393-8229

*Additional Counsel for Lincoln Educational Services Corp.*

## CORPORATE DISCLOSURE STATEMENT

1.    Pursuant to Federal Rule of Appellate Procedure 26.1, Intervenor-Appellant Lincoln Educational Services Corporation states that it is a publicly traded corporation, that it does not have a parent corporation, and that no publicly traded company owns 10% or more of its stock.

2.    Pursuant to Federal Rule of Appellate Procedure 26.1, Intervenor-Appellant Everglades College, Inc. states that it is a nonprofit corporation, that it does not have a parent corporation, and that no publicly traded company owns 10% or more of its stock.

3.    Pursuant to Federal Rule of Appellate Procedure 26.1, Intervenor-Appellant American National University, Inc., states that it is wholly owned by National University Services, Inc., a privately held Virginia corporation, and that no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................2

I.    Federal Student Loans And Borrower Defense.............................2

II.    This Lawsuit ...............................................................................4

III.    The Settlement ............................................................................6

    A.    Sub-class 1: "Automatic Relief Group"...............................7

    B.    Sub-class 2: "Decision Group" ............................................8

    C.    Sub-class 3: "Post-Class Applicants".................................8

IV.    "Exhibit C" Schools Intervene And Object To Settlement.......................9

ARGUMENT .....................................................................................11

I.    The Settlement Provides For A Self-Executing Stay Pending Appeal...........................................................................................12

II.    Intervenors Are Likely To Succeed On The Merits. ................13

    A.    The Court Lacked Jurisdiction To Approve The Settlement. ............13

    B.    The Classes Bound By The Settlement Were Never Certified Or Should Have Been Decertified. ..............15

    C.    The Department Lacks Authority To Provide The Settlement Relief. ....................................................19

    D.    The Settlement Violates Due Process. ................................27

    E.    The District Court Erred In Denying Intervention Of Right..............29

    F.    Appellants Have Standing To Appeal.................................29

III.    Appellants Will Experience Irreparable Harm........................31

IV.    A Stay Will Not Impose Irreparable Harm. ...........................37

V.    The Public Interest Favors A Stay............................................40

VI.    At A Minimum, The Court Should Grant A Stay As To Appellants.......41

CONCLUSION ..................................................................................42

# TABLE OF AUTHORITIES

## Cases

*United States ex rel. Accardi v. Shaughnessy,*
  347 U.S. 260 (1954) .................................................................24

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
  141 S. Ct. 2485 (2021) ...........................................................23

*Alvarez v. Smith,*
  558 U.S. 87 (2009) ..................................................................14

*Am. Hosp. Ass'n v. Price,*
  867 F.3d 160 (D.C. Cir. 2017) ...............................................25

*adidas Am., Inc. v. Skechers USA, Inc.,*
  890 F.3d 747 (9th Cir. 2018) ...........................................33, 35

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ...........................................................18, 19

*Assoc. Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,*
  950 F.2d 1401 (9th Cir. 1991) ...............................................30

*Beacon Theatres, Inc. v. Westover,*
  359 U.S. 500 (1959) ................................................................12

*Biden v. Nebraska,*
  143 S. Ct. 477 (2022) ..............................................................39

*Brown v. U.S. Dep't of Educ.,*
  2022 WL 16858525 (N.D. Tex. Nov. 10, 2022) ...........................1, 24

*Campbell-Ewald Co. v. Gomez,*
  577 U.S. 153 (2016) ................................................................14

*Cent. Laborers' Pension Fund v. Heinz,*
  541 U.S. 739 (2004) ................................................................24

*Chauffeur's Training Sch., Inc. v. Riley,*
  967 F. Supp. 719 (N.D.N.Y. 1997) ........................................27

*Cholakyan v. Mercedes-Benz USA, LLC*,
   281 F.R.D. 534 (C.D. Cal. 2012)................................................................17, 18

*City & Cnty. Of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
   944 F.3d 773 (9th Cir. 2019) ...............................................................21

*Conservation Nw. v. Sherman*,
   715 F.3d 1181 (9th Cir. 2013) ...............................................................24

*Davidson v. O'Reilly Auto Enters., LLC*,
   968 F.3d 955 (9th Cir. 2020) ...............................................................17

*Dewey v. Volkswagen Aktiengesellschaft*,
   681 F.3d 170 (3d Cir. 2012) ...............................................................19

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ...............................................................31, 40

*E. Bay Sanctuary Covenant v. Garland*,
   994 F.3d 962 (9th Cir. 2020) ...............................................................26

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ...............................................................18

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018)...............................................................21

*Fikre v. FBI*,
   35 F.4th 762 (9th Cir. 2022) ...............................................................30

*Frank v. Gaos*,
   139 S. Ct. 1041 (2019)...............................................................13

*FTC v. Qualcomm Inc.*,
   935 F.3d 752 (9th Cir. 2019) (per curiam) ...............................................................31

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ...............................................................38

*Genuine Parts Co. v. EPA*,
   890 F.3d 304 (D.C. Cir. 2018)...............................................................26

iv

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ...............................................................37

*Hewitt v. Grabicki*,
    794 F.2d 1373 (9th Cir. 1986) .............................................................27

*Houchins v. KQED, Inc.*,
    429 U.S. 1341 (1977) (Rehnquist, J., in chambers)............................31

*INDOPCO, Inc. v. Comm'r*,
    503 U.S. 79 (1992).............................................................................36

*Jamie S. v. Milwaukee Pub. Schs.*,
    668 F.3d 481 (7th Cir. 2012) ...............................................................18

*Jin v. Shanghai Original, Inc.*,
    990 F.3d 251 (2d Cir. 2021) ...............................................................15

*Jones v. United States*,
    529 U.S. 848 (2000)............................................................................24

*Kerley Indus., Inc. v. Pima Cnty.*,
    785 F.2d 1444 (9th Cir. 1986) .............................................................28

*Lair v. Bullock*,
    697 F.3d 1200 (9th Cir. 2012) .............................................................12

*Martinez v. United States*,
    670 F. App'x 933 (9th Cir. 2016) ........................................................14

*Meese v. Keene*,
    481 U.S. 465 (1987)............................................................................30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
    Co.*,
    463 U.S. 29 (1983)..............................................................................26

*Nat'l Treasury Emps. Union v. Horner*,
    854 F.2d 490 (D.C. Cir. 1988).............................................................26

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)............................................................................18

*Pennsylvania Higher Educ. Assistance Agency v. Perez*,
    416 F. Supp. 3d 75 (D. Conn. 2019)....................................................20

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015)............................................................................30

*Pub. Serv. Comm'n of Ky. v. FERC*,
    397 F.3d 1004 (D.C. Cir. 2005)........................................................29

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)..........................................................................22

*Ralpho v. Bell*,
    569 F.2d 607 (D.C. Cir. 1977)..........................................................28

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990) .......................................................33, 36

*Richards v. Delta Air Lines, Inc.*,
    453 F.3d 525 (D.C. Cir. 2006)..........................................................18

*Rose v. Raffensperger*,
    143 S. Ct. 58 (2022)..........................................................................12

*Settles v. U.S. Parole Comm'n*,
    429 F.3d 1098 (D.C. Cir. 2005)........................................................23

*Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Educ.*,
    493 F. Supp. 976 (D.D.C. 1980).......................................................27

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)......................................................................30

*In re U.S. Dep't of Educ.*,
    25 F.4th 692 (9th Cir. 2022) .............................................................38

*United States v. Carpenter*,
    526 F.3d 1237 (9th Cir. 2008) ..........................................................24

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)..........................................................................21

*W. Watersheds Project v. Haaland*,
22 F.4th 828 (9th Cir. 2022) ...............................................................29

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...............................................................16, 17, 18

*Wang v. Chinese Daily News, Inc.*,
737 F.3d 538 (9th Cir. 2013) ...............................................................15

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022)........................................................................1, 24

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) .............................................................16

*Zerezghi v. U.S. Citizenship & Immigration Servs.*,
955 F.3d 802 (9th Cir. 2020) ...............................................................28

## Statutes

5 U.S.C § 551 .........................................................................................24

5 U.S.C § 553 .........................................................................................24

5 U.S.C. § 706 ..................................................................................4, 5, 25

20 U.S.C. § 1077 ....................................................................................21

20 U.S.C. § 1078-10...............................................................................22

20 U.S.C. § 1078-11...............................................................................22

20 U.S.C. § 1078-12...............................................................................22

20 U.S.C. § 1082 ...............................................................................19, 20

20 U.S.C. § 1087 ....................................................................................22

20 U.S.C. § 1087e ...........................................................................3, 20, 24

20 U.S.C. § 1099c ..................................................................................4

## Rules

Fed. R. Civ. P. 23 ..........................................................5, 15, 16, 17, 18

**Treatises**

27 Williston on Contracts (4th ed.) .......................................................... 13

**Regulations**

34 C.F.R. § 668.15 ................................................................................. 4

34 C.F.R. § 668.171 ............................................................................... 4

34 C.F.R. § 685.206 .......................................................3, 4, 25, 27, 30, 32

34 C.F.R. § 685.222 .......................................................3, 4, 25, 27, 30, 32

60 Fed. Reg. 37,768 (July 21, 1995) ...................................................... 3

81 Fed. Reg. 75,926 (Nov. 1, 2016) ....................................................... 3

84 Fed. Reg. 49,788 (Sept. 23, 2019) ................................................3, 32

87 Fed. Reg. 52,943 (Aug. 30, 2022) .................................................... 21

87 Fed. Reg. 65,904 (Nov. 1, 2022) ........................................................ 3

**Other Authorities**

*Appealable*, BLACK'S LAW DICTIONARY (11th ed. 2019) ......................... 12

*Authority of the United States to Enter Settlements Limiting the Future
    Exercise of Executive Branch Discretion*,
    23 Op. O.L.C. 126 (1999) ................................................................. 24

Mem. from Principal Deputy Gen. Counsel, U.S. Dep't of Educ. to
    Sec'y of Educ. (Jan. 12, 2021) ......................................................... 21

U.S. Dep't of Education, Federal Student Loan Portfolio, Summary,
    https://studentaid.gov/data-center/student/portfolio ........................... 23

**INTRODUCTION**

The President has directed the Department of Education ("Department") to implement a national program of blanket cancellation of student-loan debt. *See Brown v. U.S. Dep't of Educ.*, 2022 WL 16858525, at *2 (N.D. Tex. Nov. 10, 2022). The Department has complied by announcing two sweeping debt-cancellation programs. The first program—a plan to cancel $10,000 of loans per debtor—proceeds under the Higher Education Relief Opportunities for Students Act of 2003 (HEROES) Act. A federal court has vacated that program of "vast 'economic and political significance'" because it exceeds the Secretary's authority. *Brown*, 2022 WL 16858525, at *11-12 (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2607-14 (2022)). The Supreme Court will address the issue this Term. *See Biden, et al. v. Nebraska, et al.*, No. 22-506 (U.S. Dec. 1, 2022); *Dep't of Educ. v. Brown*, No. 22-535 (U.S. Dec. 12, 2022)).

The second program is the subject of this appeal. Through a collusive, nationwide class settlement of a lawsuit that sought to compel the Department merely to restart *adjudication* of applications for loan cancellation, the Department will instead ignore its regulations, forego adjudication altogether, and cancel billions in loans for hundreds of thousands of debtors. Specifically, the Department will cancel the debt and refund all past payments for individuals who attended any of 151 schools that the Department has "determined"—in secret negotiations with

1

Plaintiffs—engaged in "substantial misconduct." The schools at issue have been given no opportunity to defend themselves and, in many instances, have not even received notice of the allegations for which they have been convicted.

To explain this unprecedented, sweeping settlement is to detail its illegality. It has stripped hundreds of institutions of due-process and Administrative Procedure Act (APA) rights. It is based on a claim of statutory authority, under the Higher Education Act (HEA), even more sweeping than that claimed under the HEROES Act—a supposed authority that permits the Department to cancel, *en masse*, every student loan in the country. And the Department has done all this in a class action that it says is (1) moot and (2) cannot maintain a certified class.

Appellants are three educational institutions that have been named in the settlement, involuntarily, and intervened to protect their rights. They seek an orderly appellate review, but the Department has announced it will effectuate the settlement **immediately,** rather than on the year-plus timeframe permitted by the settlement. Accordingly, the schools seek a stay pending appeal.

## BACKGROUND

### I.    Federal Student Loans And Borrower Defense

Under Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*, the Secretary of Education administers student-loan programs, including the Direct Loan Program, which issues loans from the federal government, and the Federal

Family Education Loan Program, which, until 2010, allowed students to obtain private loans guaranteed by the federal government.  For Direct Loans, the Secretary must "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment."  20 U.S.C. § 1087e(h).  The Department of Education ("Department" or "ED") has done so in 1995 (60 Fed. Reg. 37,768 (July 21, 1995)), in 2016 (81 Fed. Reg. 75,926 (Nov. 1, 2016)), in 2019 (84 Fed. Reg. 49,788 (Sept. 23, 2019), and in 2022 (87 Fed. Reg. 65,904 (Nov. 1, 2022)).  These regulations establish a "borrower-defense" ("BD") program allowing Direct Loan borrowers to obtain debt cancellation if they prove their school engaged in certain misconduct.

The BD process proceeds in two steps.  In Step One, the Department must provide notice to the school of a BD claim.  34 C.F.R. §§ 685.206(c)(2) & (e)(10), 685.222(e)(3)(i).  For loans issued before July 1, 2020, the Department must "consider[] … [a]ny response or submissions from the school."  *Id.* § 685.222(e)(3)(i).  A Department official then adjudicates the applications "through a fact-finding process" and issues a written decision.  *Id.* § 685.222(e)(3)-(4).  For loans issued after July 1, 2020, the Department must "provide a copy" of the application to the school, affirmatively "invite the school to respond and to submit evidence" in its defense, *id.* § 685.206(e)(10), and "consider … the school's response."  *Id.* § 685.206(e)(11)-(12).  The Department then must issue a written

decision with reasoning. *Id*. Step Two occurs only if—after a Step-One adjudication—the Department finds a school engaged in misconduct, grants a BD application, and discharges debt. In that case, the Department may initiate proceedings to recover the discharged amount from the school. *See id.* §§ 685.206(c)(3) & (e)(16), 685.222(e)(7).

Regardless of whether the Department engages in a Step-Two recoupment proceeding, the Step-One findings can form the predicate for significant programmatic, financial, and reputational consequences aside from recoupment, such as fines and limitations, suspensions, or terminations of a school's right to participate in federal aid programs. *See* App.376-77 (Declaration of Benjamin Miller, citing 34 C.F.R. §§ 668.81-99); *see also* 20 U.S.C. § 1099c(c); 34 C.F.R. §§ 668.15, 668.171 (factors affecting school's "Financial Responsibility Composite Score," which can affect participation in federal aid).

## II.     This Lawsuit

In 2019, borrowers sued the Department, alleging a "policy of inaction" on their BD applications constituted "unlawfully withheld and unreasonably delayed agency action" under 5 U.S.C. § 706(1). App.48, 102-05 at ¶¶ 7, 377-404.[1] Plaintiffs were explicit in describing the relief they sought (and did not seek):

Plaintiffs … do not ask this Court to adjudicate their borrower defenses.

---

[1] Plaintiffs also brought a second count that was ultimately dismissed. *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal. Oct. 1, 2019), Dkt. 41.

> Nor do they ask this Court to dictate how the Department should prioritize their pending borrower defenses. Their request is simple: they seek an order compelling the Department to start granting or denying their borrower defenses and vacating the Department's policy of withholding resolution.

App.48-49 at ¶ 10. Plaintiffs reiterated this position in moving to certify a Rule 23(b)(2) class, stating they sought "a single injunction requiring the Department to start and to continue adjudicating borrower defenses." Reply ISO Motion to Certify Class at 6, *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal. Oct. 1, 2019), Dkt. 42. Because "*the Department ha[d]*"—at the time—"*decided zero applications since June 2018*," the district court certified a Rule 23(b)(2) class:

> All people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*.

App.112, 121. "This class definition," the district court held, "shall apply for all purposes, ***including settlement***." App.121 (emphasis added). The Class includes about "264,000 Class Members who received more than an estimated $7.5 billion in loans. App.205.

After a failed settlement attempt in 2020, Plaintiffs supplemented their complaint with claims that ED had adopted an unlawful "presumption of denial" policy in violation of 5 U.S.C. § 706(2) and due process. App.195-97 ¶¶ 436-455. Plaintiffs sought an order declaring class members "are entitled to a decision, on the

merits" and that form denials are invalid and compelling the Department "to lawfully adjudicate each and every borrower defense application." App.198-99.

On January 25, 2022, the Parties reported to the Court they were again engaged in settlement negotiations but provided no details. Status Report, *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal.), Dkt. 213. Six months later, on June 22, 2022, the Parties filed a Joint Motion for Preliminary Approval of Settlement. App.201. Attached thereto was a fully executed settlement agreement. App.224 (the "Settlement"). Simultaneously, on June 23, the government filed a summary judgment motion. App.304. The government represented that "the Department has already provided the very relief that Plaintiffs sued to obtain" and thus the case "***is moot and must be dismissed***." App.314-15 (emphasis added). The government also represented there is no longer a basis for the court to grant class-wide relief. App.315.

### III. The Settlement

Despite the district court's certification of only an indivisible injunctive class, the Settlement creates three subclasses and provides injunctive or monetary relief to each. And despite the Plaintiffs' seeking only a restart of adjudication and rescission of alleged "form" denials, the Settlement sweeps far more broadly. The Settlement proceeds as follows:

6

### A.    Sub-class 1: "Automatic Relief Group"

For Class members who have debt "associated with the schools, programs, and School Groups listed" in Exhibit C to the Settlement, the Department will, within twelve months of final judgment, automatically: (i) "discharge" the debt, (ii) refund "all amounts … previously paid to the Department," and (iii) delete the credit tradeline associated with the debt.  App.227 (Definition "S"), App.229-30.  If there is a "substantial question" as to whether debt "is associated with" a listed school, that "question will be resolved in favor of the Class Member (*i.e.*, in favor of granting relief)" without further inquiry, adjudication, or process provided to the school. App.230.  The Parties estimate that 75% of the Class (200,000 borrowers) will receive this automatic debt cancellation and refunds without individualized adjudication of their claims.  App.206.

Exhibit C lists 151 institutions.  The Settlement offers no explanation as to why any school is on the Exhibit C list, but the motion seeking preliminary approval offered a single sentence of explanation:

> [B]ecause the Department has identified common evidence of institutional misconduct by the schools, programs, and school groups identified in Exhibit C to the Agreement, it has determined that every Class Member whose Relevant Loan Debt is associated with those schools should be provided presumptive relief under the settlement due to strong indicia regarding substantial misconduct by the listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools.

7

App.220-21.  The motion seeking final approval added that the Exhibit C list "was created based on information available to the Department at the time the agreement was executed regarding demonstrated or credibly alleged misconduct, as well as a review of the comparative rate of Class Members with applications concerning the listed schools."  App.412.  After preliminary approval, the parties removed some schools from the Exhibit C list that "were erroneously included" due to unexplained "clerical errors" and added a new school.  App.381.

### B.     Sub-class 2: "Decision Group"

For Class members whose debt is not associated with an Exhibit C school— about 68,000 borrowers, App.206—the Settlement establishes a new "review" process not found in any operative BD rule.  The "review" requires a series of presumptions that essentially guarantee a finding of wrongdoing by any accused school and, thereafter, debt cancellation and refunds.  As a result of these presumptions, a borrower's claim cannot be denied for (1) false allegations, (2) insufficient evidence, (3) lack of reliance, or (4) untimeliness, App.230-31.

### C.     Sub-class 3: "Post-Class Applicants"

Finally, the Settlement creates a third sub-class of "Post-Class Applicants," which includes any person who "submits a borrower defense application after the Execution Date … but before the Final Approval Date."  App.234.  In other words, the Settlement created an avenue to encompass any person who held a federal student

loan, and the settling parties spent months recruiting people to enter this sub-class. *See* App.414 (detailing efforts to solicit BD claims). For Post-Class Applicants, the Settlement requires ED to "review" their applications pursuant to the standards established in the 2016 Rule, even though the BD regulations normally require different standards for many of these applications. App.234. If ED does not complete the "review" within thirty-six months, regardless of reason, ED must cancel the applicant's debt and refund prior loan payments, regardless of the merits of the application. *Id*. In other words, within three years the Department of Education can unilaterally cancel federal student-loan debt—and refund prior payments on student debt—by simply not acting.

### IV. "Exhibit C" Schools Intervene And Object To Settlement

After the parties lodged the settlement, four educational institutions ("Intervenors") listed on Exhibit C moved to intervene of right or permissively. The district court denied intervention of right but granted permissive intervention on the condition that Intervenors could not seek discovery regarding ED's Exhibit C determination or the settlement process generally. App.390-91.

The settling parties moved for final approval of the Settlement. App.392. Intervenors filed objections, arguing that the court could not approve the Settlement because: (1) the case was already moot; (2) class certification could no longer be maintained; (3) the Department did not have statutory authority to agree to the relief

9

in the Settlement; (4) the Department would violate the APA by entering into and effectuating the Settlement; and (5) the Settlement violates Intervenors' due process rights. The district court overruled all objections and granted final approval to the Settlement as written. App.491. Three Intervenors ("Appellants") timely appealed, App.42, and this Court consolidated the appeals.

Appellants jointly moved the district court to stay effectiveness of its final judgment pending appeal. App.42. Appellants submitted supplemental declarations detailing the regulatory and reputational harms they would face—and were already beginning to experience—if a stay is denied. App.517-28. That evidence included a showing that (1) the Federal Trade Commission had publicized "the list of schools included in the *Sweet* settlement" to solicit more borrower-defense applications App.519-20; (2) Lincoln had been denied an opportunity to speak with a class at a Nevada high school because of its inclusion on Exhibit C, App.518-19; (3) Lincoln had to describe this litigation as a material risk in its financial reporting with the Securities and Exchange Commission, App.521; and (4) ECI has faced additional scrutiny, and denials, from financial partners due to questions about ECI's inclusion on Exhibit C, App.526.

Under the Settlement, the Department has one year from the "Effective Date" (January 28, 2023) to provide relief to the Automatic Relief Subclass. App.226, 229. Nevertheless, the Department announced—at a status conference on January 26,

10

2023—that, on January 30, 2023, it would instruct loan servicers to "start performing discharges" for "about 99-percent of borrowers in Exhibit C." January 26 Hearing Tr. 5:24-6:6, *Sweet v. Cardona*, No. 3:19-cv-3674 (N.D. Cal.), Dkt. 360. The district court ordered the Department to refrain from such action "until appealing intervenors have an opportunity to have their motion heard and the order on their motion issues." App.43.

Despite Appellants' detailed showing of harm, on February 24, the district court denied a stay. App.555-56. The court reasoned that Appellants had not shown "likely" regulatory or reputational harm "that a stay would counteract." App.545. On the merits, the court "st[ood] by its analysis" in approving the settlement, adding only that the purported failure of Appellants' due process and reputation-based arguments on the merits somehow called into question Appellants' Article III standing. App.552-53.

The district court imposed a seven-day stay—applicable only to loans associated with Appellants—to permit an application to this Court for a stay pending appeal.

## ARGUMENT

The Court should stay the judgment. The Settlement Agreement contemplates a stay pending appeal. Appellants are likely to succeed on the merits, a stay would

avoid irreparable harm, the balance of equities favors Appellants, and a stay furthers the public interest. *See Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).

## I.    The Settlement Provides For A Self-Executing Stay Pending Appeal.

A stay pending appeal is "equitable" relief, *Rose v. Raffensperger*, 143 S. Ct. 58, 59 (2022) (mem.), and before awarding such relief a court should consider remedies at law, *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959). Here, the Settlement provides for a self-executing stay pending appeal. If the Court recognizes that the Settlement cannot take effect until appeals are resolved, the Court need not consider equitable stay relief.

Section II.K. of the Settlement defines "Effective Date" as occurring upon one of two events: (1) a "non-appealable" final judgment, or (2) "final resolution" of any class objector appeal. App.226. Here, the first event has not occurred. There is no "non-appealable" judgment because the final judgment *has been appealed*. At the time of drafting, there were no intervenors in the case, so section II.K does not expressly discuss final resolution of an *intervenor* appeal. But that does not erase the first requirement that only a non-appealable judgment triggers the Effective Date. Contrary to the district court's interpretation, App.538, nothing in the Settlement or common usage indicates that "non-appealable" includes a final judgment that has been appealed. *Cf. Appealable*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("capable of being appealed").

12

The condition that the Settlement is not "voided" under Section XIII, *see* App.226, also confirms that the Effective Date is delayed until all appeals are resolved. Section XIII.A. states: "This Agreement shall be void if it is not approved as written by a final Court order not subject to any further review." App.248. "A void contract … binds no one and is a mere nullity" with no legal effect. 27 Williston on Contracts § 70:13 (4th ed.). Thus, the parties provided that the Settlement could be rendered null until the final judgment is "not subject to any further review," App.248, regardless of who seeks review.

Appellants respectfully ask either that the Court (1) find the Effective Date automatically delayed pending appeal or (2) grant a stay pending appeal.

## II. Intervenors Are Likely To Succeed On The Merits.

On the merits, Appellants are likely to succeed because final approval of the Settlement was barred by jurisdictional requirements, class-certification requirements, and the limits of the Department's authority under the HEA, APA, and due process.

### A. The Court Lacked Jurisdiction To Approve The Settlement.

"A court is powerless to approve a proposed class settlement if it lacks jurisdiction over the dispute." *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019). Plaintiffs sought only two forms of relief in this lawsuit: (1) an end to the "policy of inaction" on BD claims, and (2) a rescission of alleged "form denials" of a subset of

13

BD claims.  App.48 ¶ 7, App.124 ¶ 6.  In June 2022, the Department informed the district court that this case was moot.  App.314, 323-25, 337.  Richard Cordray, Chief Operating Officer for Federal Student Aid, testified that (1) "[o]ver the last approximately 18 months, … the Department ha[d] prioritized … adjudication of borrower defense applications," approving tens of thousands of them, and (2) "[a]ll applications … previously denied with a form denial notice will be reconsidered." App.346-47 ¶¶ 8-9.  Tellingly, the Department has not retracted its position that this case was moot *before* it lodged the Settlement.  App.322-25.

The district court overruled this objection because the Department has not yet adjudicated *every* Class member's BD application.  App.485.  But Plaintiffs were adamant in their Complaint they "d[id] ***not*** ask" the court "to adjudicate their borrower defenses" or "to dictate how the Department should prioritize their pending borrower defenses." App.48-49.  "Their request [wa]s simple: they s[ought] an order compelling the Department ***to start*** granting or denying their borrower defenses and ***vacating the Department's policy*** of withholding resolution." *Id.* (emphases added). Once Plaintiffs received the relief they requested in the Complaints—long before the Settlement was lodged—this case was moot and should have been dismissed. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 164 n.5 (2016); *Alvarez v. Smith*, 558 U.S. 87, 92 (2009); *Martinez v. United States*, 670 F. App'x 933, 934 (9th Cir. 2016) (APA unlawful-delay claim moot if agency has ended delay).

14

### B. The Classes Bound By The Settlement Were Never Certified Or Should Have Been Decertified.

"[D]istrict courts must ensure that a certified class satisfies Rule 23 throughout the litigation" and must "alter or decertify the class if that is no longer the case." *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021); *see also Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 546 (9th Cir. 2013) ("district court should consult the entire record of [a] case" in determining whether to decertify a class). The classes of persons bound by the Settlement were either (1) never properly certified as a class, or (2) no longer satisfied the requirements of Rule 23(a) and (b) and should have been decertified.

First, the Settlement erroneously purports to bind a subclass never certified and not represented by any named plaintiff. According to the Settlement, the Class "consist[s] of all people who borrowed a Direct Loan or FFEL loan ... who have asserted a borrower defense to repayment to the Department, whose borrower defense has not been granted or denied on the merits." App.228 § III.A. This class "closed as of the Execution Date," App.229 § III.D, which was on or before June 22, 2022, App.226 § II.L. Yet the Settlement provides relief to—and binds as "Plaintiffs"—any individual who "submit[ted] a borrower defense application after the Execution Date (*i.e.*, the date the class closes), but before the Final Approval

Date" of November 16, 2022.  App.227, 234 §§ II.U, IV.D.1.[2]

Second, under the Settlement, the actual certified Class members no longer satisfied Rule 23(a)'s commonality and typicality requirements.  Commonality requires a "single common question" that unites a class's claims.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (cleaned up).  And typicality requires "the same or similar injury, … conduct which is not unique to the named plaintiffs, and … other class members … injured by the same course of conduct."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (cleaned up).  The district court ruled that the issue uniting all Class members' claims was that they "remain subject to the same delay and allegedly unlawful policies."  App.486.  But the Department had already terminated those policies, and so the settling parties did not even rely on that theory.  Instead, they reframed this suit as "challeng[ing] all aspects of the Department's process of adjudicating a significant number of pending BD applications," including "the substance of … the decisions that the Department has rendered."  App.418.  The substance of individualized decisions is not common to, or typical of, every Class member.  As the Parties admit, these "complicated

---

[2] There are approximately 250,000 post-class applications.  Response at 1, *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal. Feb. 16, 2023), Dkt. 380.  The district court sidestepped this issue on the theory that "the class certification order set no cut-off date for membership."  App.488.  But that definition is not the one used in the all-or-nothing Settlement, App.291 § XIII.A, and it is *that* document that the Court approved in the Order Granting Final Settlement Approval.

matters" leave "considerable uncertainty about the appropriate remedy," particularly given the "***differences among Class Members' circumstances***." App.406-08 (emphases added). Moreover, the relief that flows from Exhibit C relies on the Department's individualized determinations about each school—issues that cannot possibly be common to the entire Class. "If there is no evidence that the entire class was subject to the same [unlawful] practice, there is no question common to that class." *Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 967 (9th Cir. 2020) (alteration in original) (citation omitted).

<u>Third</u>, the Class was certified under Rule 23(b)(2), App.120, which "applies only when a *single* injunction or declaratory judgment would provide relief to *each* member of the class." *Wal-Mart*, 564 U.S. at 360 (emphasis added). Plaintiffs "cannot seek certification under Rule 23(b)(2) by combining an array of remedies, some of which will benefit only certain subsets of the class, and contending that each member of the class can avail himself or herself of one or more of the proposed remedies." *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012). But the Settlement provides multivariate relief that could be realized only through multiple injunctions that apply to distinct subsets of the Class.

Moreover, the reimbursement relief provided to Automatic Relief subclass cannot be obtained in a Rule 23(b)(2) settlement because that Rule "does not authorize class certification when each class member would be entitled to an

17

individualized award of monetary damages." *Wal-Mart*, 564 U.S. at 360-61. Plaintiffs cannot satisfy Rule 23(b)(2) by "'superficially structur[ing] their case around a claim for class-wide injunctive and declaratory relief' if "the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made.'" *Cholakyan*, 281 F.R.D. at 560 (quoting *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 499 (7th Cir. 2012)); *see also Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 531 (D.C. Cir. 2006).

The district court reasoned that Rule 23(b)(2) is irrelevant because "a settlement can provide broader relief than a court could have awarded after a trial." App.487. Whatever the merits of this principle in other contexts, the Supreme Court has repeatedly held Rule 23 "demand[s] undiluted, even heightened, attention ***in the settlement context***." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (emphasis added); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 849 (1999).

<u>Fourth</u>, class certification can be maintained only if "named plaintiffs and their counsel [do not] have … conflicts of interest with other class members." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citation omitted). Here, an intra-Class conflict is baked into the Settlement's structure, which divides the Class into three subgroups receiving differing relief. *See, e.g.*, App.405 (noting that the Settlement encompasses a tradeoff between Path 1 and Path 2 in terms of allocating Department resources). When a settlement "divides a single class into …

18

groups of plaintiffs that receive different benefits," "[t]he structure of the settlement agreement itself … supports the inference that the representative plaintiffs are inadequate." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 187 (3d Cir. 2012); *see also Amchem*, 521 U.S. at 627 ("[A]dversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." (citation omitted)).

### C. The Department Lacks Authority To Provide The Settlement Relief.

The district court correctly recognized that the Department of Justice "cannot agree to something that the Secretary of Education cannot do in the first place." App.473. It erred, however, in concluding that the Secretary has authority to enter this unprecedented Settlement, which violates the HEA and APA.

### 1. The Secretary Lacks Authority Under The HEA.

In the *Nebraska*/*Brown* litigation, the Department claims the HEROES Act authorizes it to cancel every student loan in the country during a "national emergency" such as a respiratory pandemic. Here, the Department goes even further and claims that not even a national emergency is necessary because the HEA, 20 U.S.C. § 1082(a)(6), separately authorizes the Secretary to cancel all student-loan debt *en masse*. The HEA does no such thing.

19

Subsection 1082(a)(6) states: "In the performance of, and with respect to, the functions, powers, and duties, vested in him ***by this part***, the Secretary may ... enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption." 20 U.S.C. § 1082(a)(6) (emphasis added). "This part" is Part B of the HEA, 20 U.S.C. §§ 1071–1087-4, which addresses only the FFEL Loan Program, not the Direct Loan Program. Because "the vast majority" of loans "at issue here" are "direct loans," August 4, 2022 Hearing Tr. 14:10-12, *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal.), Dkt. 311, subsection 1082(a)(6) does not provide authority to grant most of the relief specified in the Settlement.

To circumvent this problem, the Department cites HEA Part D, which states that Direct Loans "shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers" under Part B. 20 U.S.C. § 1087e(a)(1). But the Department failed to explain how the Secretary's general "functions, powers, and duties" in section 1082 constitute "terms, conditions, and benefits" of Part B loans, nor are those terms equivalent under any common or reasonable definitions. As one court has explained, the HEA has no "language incorporating into Part D the Secretary's 'general powers' ... of Section 1082, from Part B." *Pennsylvania Higher Educ. Assistance Agency v. Perez*, 416 F. Supp. 3d 75, 96 (D. Conn. 2019). Instead, terms and conditions are found elsewhere in the

statute. *See* 20 U.S.C. § 1077 (titled "terms of federally insured student loans"). There is no ambiguity: subsection 1082(a)(6) applies only to FFEL loans, and the incorporation clause of 1087e(a)(1) applies to terms, conditions, and benefits of loans, not the Secretary's "functions, powers, and duties."

Disregarding the plain statutory meaning, the district court "defer[ed]" to the Department's interpretation. App.474. But such deference is permissible only after exhausting the "traditional tools of statutory construction," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018), starting with the plain text, *City & Cnty. Of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 791 (9th Cir. 2019), and only if the interpretation is found in "rules carrying the force of law," such as "notice-and-comment rulemaking," *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). None of those necessary conditions were met here. Indeed, during the pendency of this very litigation, the Department explicitly disclaimed the interpretation it now adopts.[3]

Even if subsection 1082(a)(6) is interpreted (wrongly) to apply to Direct Loans, it does not provide authority for blanket debt cancellation. Subsection

---

[3] *See* Mem. from Principal Deputy Gen. Counsel, U.S. Dep't of Educ. to Sec'y of Educ. at 4 & n.3 (Jan. 12, 2021). Although the Department conveniently rescinded this memorandum after Intervenors relied on it in this case, the Department did so based on disagreement with the 2021 memorandum's treatment of the HEROES Act, not subsection 1082(a)(6). *See* 87 Fed. Reg. 52,943 (Aug. 30, 2022).

1082(a)(6) is a summary grant of "General powers" tied to the Secretary's "performance of ... the functions, powers, and duties, vested in him by this Part." "[I]t is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (alteration in original) (citation omitted). Part B more specifically details many "functions, powers, and duties" of the Secretary, including authorization to discharge FFEL Loans pursuant to carefully delineated conditions, terms, and amounts. *See* 20 U.S.C. §§ 1078-10, 1078-11, 1078-12, 1087. To read subsection 1082(a)(6) as providing the power to grant blanket debt cancellation would improperly render these provisions superfluous. *RadLAX*, 566 U.S. at 646. Additionally, this reading of subsection 1082(a)(6) cannot be squared with the Department's reading of the HEROES Act, which the Solicitor General says provides the power for *en masse* debt cancellation in cases of national emergency. Petrs. Br. at 34-57, *Biden v. Nebraska*, No. 22-506 (U.S. Jan. 4, 2023). If the Secretary can cancel loans *en masse* at *any time*, there was no need for Congress to also authorize such power during specific national emergencies.

Moreover, if everything in subsection 1082(a) is interpreted (wrongly) as "terms, conditions, and benefits" of Direct Loans, then subsection 1082(a)(2) is equally applicable and no "injunction … or other similar process … shall be issued against the Secretary." The district court ignored this jurisdictional bar because the

Department "is requesting and consenting" to the injunctive relief, App.478, but an executive department cannot provide the Judicial Branch with more expansive jurisdiction than Congress provided. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1105 (D.C. Cir. 2005).

Finally, the major-questions doctrine supports the conclusion that the Department does not have the authority it claims. The Settlement encompasses a "staggering number" of borrowers, App.477, and at least $7.5 billion of debt owed to American taxpayers (an amount that has probably doubled by the influx of applications from "Post-Class Applicants"), App.205. Moreover, the power the Department claims to justify the Settlement is the power to cancel *all* student loans *en masse—**a $1.6 trillion issue**.*[4] After all, subsection 1082(a)(6) applies to "*any* right, title, claim, lien, or demand," so it is of no moment that this particular application of the claimed authority is "rooted in, and limited to, this litigation." App.476 n.2. The Secretary thus "has identified no limit" to his authority. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). As the *Brown* court held, an agency's claim of power over an issue of such "vast 'economic and political significance'" falls under the "major-questions doctrine" and requires the government to show "'***clear*** congressional

---

[4] *See* U.S. Dep't of Education, Federal Student Loan Portfolio, Summary, https://studentaid.gov/data-center/student/portfolio.

authorization.'" *Brown*, 2022 WL 16858525, at *11-12 (quoting *West Virginia*, 142 S. Ct. at 2607-14) (emphasis added). Neither the Department nor the Final Order points to any "clear" language regarding the asserted authority. Moreover, the Secretary's reading of the statutory text to grant *unlimited* authority over a trillion-dollar-plus industry raises significant constitutional questions over the delegation of legislative power that should be avoided. *See Jones v. United States*, 529 U.S. 848, 857 (2000).

### 2. The Settlement Violates The APA.

The decision to enter a settlement is agency action that must comply with the APA. *See United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008); *Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.L.C. 126, 129 (1999). The agency action encompassed in the Settlement violates the APA in several ways.

First, the Settlement violates the bedrock principles that an agency must abide by its own regulations and must adopt new rules through notice-and-comment procedures. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 748 (2004); 5 U.S.C §§ 551(4), 553; *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013). The HEA, 20 U.S.C. § 1087e(h), gives the Secretary authority to "specify *in regulations*" the process for resolving BD claims. *Id.* (emphasis added). The

Secretary did so, 34 C.F.R. §§ 685.206, 685.222, and cannot circumvent those regulations by "craft[ing]" a new "process for resolving the enormous backlog of claims," App.479. The district court dismissed this issue by concluding that the "regulations remain in place," *id.*, but the regulations are meaningless if, as a practical matter, they will be ignored and replaced by a new process. This "type of mass settlement" of BD claims is "illegal" because governing regulations do not permit the Department to cancel loans "regardless of the merit of those claims." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167 (D.C. Cir. 2017).

<u>Second</u>, the Settlement violates the APA's prohibition on arbitrary action. 5 U.S.C. § 706(2)(A). The Department alternatively claims that its determination to automatically grant every BD application associated with 151 schools was based on "strong indicia," App.206, "sufficient indicia," App.405, or "certain indicia," App.407, of misconduct by listed schools—and "on information" it had "regarding demonstrated or credibly alleged misconduct" and "the comparative rate of Class Members with applications concerning the listed schools." App.412. The Department failed to specify any of the "indicia" of misconduct; what "information" it relied upon; and which schools made the list because of "demonstrated" misconduct, versus "credibly alleged misconduct," versus merely the "rate of … applications concerning the listed school[]"—much less to explain what constitutes "demonstrated," "credibly alleged," or a sufficiently high "comparative

rate." These vague, conclusory statements are the opposite of a "satisfactory explanation," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), that "present[s] … data," *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988), to justify an agency determination.[5]

Moreover, an agency "cannot ignore evidence that undercuts its judgment." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018); *see also E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 980 (9th Cir. 2020). Yet in the only record document related to ECI, the Department said it reviewed "a sample of 50 applications" and concluded it "has not identified evidence that suggests that the Everglades is participating in … activity that would support borrower defense discharges." Dkt. 193-3 at 41, *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal. Mar. 18, 2021). The Department also submitted an exhibit to identify any "final determinations" that certain schools had "engaged in fraudulent conduct for which borrower defense relief may be granted," and identified "None" for Lincoln. Dkt. 145-2 at 13, *id.* (Oct. 14, 2020). Despite this *exculpatory* evidence, the Department "determined" without explanation that "substantial misconduct" occurred at ECI and Lincoln, App.220-21.

---

[5] After the district court granted preliminary approval of the Settlement, the settling parties admitted they had "erroneously" included some schools on the Exhibit C List and excluded another school. App.381. The settling parties provided no explanation for these "errors," further demonstrating the arbitrariness of the Department's highly consequential determination.

### D.    The Settlement Violates Due Process.

The Settlement also strips the schools of liberty and property interests without due process. *Hewitt v. Grabicki*, 794 F.2d 1373, 1380 (9th Cir. 1986).  Intervenors have a protected liberty interest in their reputation and "a property interest in retaining the funds in [their] accounts" and thus possess an interest in Title IV loan proceeds already received. *Chauffeur's Training Sch., Inc. v. Riley*, 967 F. Supp. 719, 729 (N.D.N.Y. 1997).  The Department's publication of Exhibit C has inflicted—and will continue to inflict—severe reputational harms.  And contra the district court's baseless assertion that these reputational harms are not accompanied by any additional harm, App.552-53, the "stigma" of inclusion on a list of wrongdoers "bearing the imprimatur of the [Department of Education]" immediately affects their relationship with current and prospective students and can cause schools to "los[e] additional students to competitors," "los[e] donations," and suffer other consequences. *Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Educ.*, 493 F. Supp. 976, 978-79 (D.D.C. 1980).  Moreover, Title IV funds are dispersed subject to the government's limited right of recoupment, but that right is prescribed in regulations that set strict procedures and time limits.  *See* 34 C.F.R. §§ 685.206, .222.  And BD claims are now time-barred for many loans at issue, precluding even any possibility of recoupment.  Yet the Settlement revives these time-barred claims, as well as the threat of recoupment.  Worse still, the Settlement will grant claims that

are wrong on the merits—i.e., that are false. Property rights that had been vested are now, it would appear, contingent. This squarely implicates due process. *Kerley Indus., Inc. v. Pima Cnty.*, 785 F.2d 1444, 1446 (9th Cir. 1986).

Despite these liberty and property interests, Intervenors have been offered *no* process to defend against their inclusion in Exhibit C (or in the new process for Post-Class Applicants). The Department has publicly branded every school on Exhibit C as engaging in "institutional" and "substantial misconduct," App.206, 220, without providing any notice to the schools that this determination process was occurring, without any official finding of wrongdoing, and without *any* opportunity to rebut the claims—much less the procedure guaranteed by the regulations. This absence of process is unconstitutional. *Zerezghi v. U.S. Citizenship & Immigration Servs.*, 955 F.3d 802, 813 (9th Cir. 2020); *Ralpho v. Bell*, 569 F.2d 607, 628 (D.C. Cir. 1977).

It is no answer that "the schools cannot be held liable for any remedial measures absent proceedings initiated specifically against them." App.480. The BD regulations provide schools notice and a right to meet and rebut evidence through *two* different steps: Step One—the lawful adjudication of allegations contained in a BD application; and Step Two—recoupment or other related disciplinary proceeding. That the Settlement is silent as to Step Two proceedings does not cure the due-process violations inherent in eliminating Step One protections. *See Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1012 (D.C. Cir. 2005) (rejecting

agency argument that rehearing procedure cured due-process violation of "announcing its decision *sua sponte* without prior notice to the parties" because "[c]onsidering petitioners' arguments" after the fact "is not the same thing as allowing them to present evidence on the issue").

### E. The District Court Erred In Denying Intervention Of Right.

Appellants also are likely to prevail on their appeal of the district court's denial of intervention of right (App.390). The district court declined to find that Appellants have property rights in the Settlement. But, as the arguments above show, Appellants clearly have property rights in the settlement, in the BD regulations, and in safeguarding their reputations. *See W. Watersheds Project v. Haaland*, 22 F.4th 828, 842 (9th Cir. 2022) (court should grant intervention as of right when proposed intervenor holds "a property interest that is imperiled by th[e] litigation"). As discussed below, Appellants each are concretely injured by the unlawful deprivation of those rights. The district court thus erred in denying intervention of right.

### F. Appellants Have Standing To Appeal.

The district court reasoned that Appellants do not have standing to appeal. App.552-53. The court reasoned that Appellants' reputational injuries were insufficient for standing because Intervenors purportedly failed to establish a "plus factor" on top of those reputational harms. App.553. But even if the court were

correct (it was not), proof of a "plus factor" is a requirement for proving a due-process claim based on reputational injury **on the merits**. *Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022). For Article III standing, reputational injuries are cognizable in their own right. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021); *Meese v. Keene*, 481 U.S. 465, 473-74 (1987).[6]

The court also ignored every other harm suffered by Intervenors, such as the loss of Step-One procedural protections available under the BD regulations to protect the financial interests of schools. Notably, because the Settlement allows "post-class applicants" to have their BD applications processed under the 2016 regulations, the Settlement extends the statute of limitations applicable to those claims by *three years*. *Compare* 34 C.F.R. § 685.222(c) & (d), *with* 34 C.F.R. § 685.206(e)(6). This change has the force of law and aggrieves Appellants. If the Department had taken the same action by publishing an informal notice in the Federal Register, schools no doubt would have standing to challenge the action under the APA. They would be aggrieved, and they would have injury in fact, causation, and redressability. *E.g.*, *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 95 (2015) (challenge to agency failure to promulgate rule through notice-and-

---

[6] The district court faulted Appellants for not separately discussing standing in their reply, App.552, but their discussion of irreparable harm *included* the lesser showing of harm needed for standing. *Assoc. Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).

comment procedures). That the Department achieves the same result through a settlement affecting third parties makes no difference for standing.

### III. Appellants Will Experience Irreparable Harm.

Denial of a stay would immediately, irreparably harm Appellants. If the judgment goes into effect, all schools on Exhibit C will immediately have all BD claims against them resolved by granting full discharges and refunds—without any administrative process, judicial factfinding, or reasoned decision on the merits. This will have immediate regulatory and reputational consequences for schools, infringe schools' constitutional rights, and establish reliance interests for class members that will make it all but impossible to "undo[]" these actions should Appellants "prevail on appeal." *FTC v. Qualcomm Inc.*, 935 F.3d 752, 756 (9th Cir. 2019) (per curiam). The Court should temporarily preserve the status quo and safeguard its "ability to render a meaningful decision on the merits." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020); *accord Houchins v. KQED, Inc.*, 429 U.S. 1341, 1346 (1977) (Rehnquist, J., in chambers) ("[T]he preservation of th[e] status quo is an important factor favoring a stay.").

1.      For schools on Exhibit C, effectuating the Settlement will immediately extinguish their rights in pending BD adjudications. Under the Department's binding regulations, schools have a right to receive notice of BD applications, a right to submit evidence in the factfinding process that forms the administrative record,

and a right to a reasoned decision. *See* 34 C.F.R. §§ 685.206(c)(1)-(2), (e)(10)-(11),
.222(e)(3)(i). These are essential steps in the administrative process. Resolution of
a BD application in favor of an applicant ordinarily serves as a precursor to further
adverse action against a school—including an action to recoup the amount of a
forgiven loan. *See, e.g.*, *id.* § 685.222(e)(7). A school's ability to participate in the
initial adjudication is thus an important right designed to "reduce the likelihood" that
a school will later "be burdened by [an] unjustified claim[]." *Student Assistance
General Provisions*, 84 Fed. Reg. 49,788, 49,825 (Sept. 23, 2019). In characterizing
schools' interests as "not even implicated" in pending BD adjudications, App.542,
the district court entirely ignored the crucial purposes schools' participation rights
are crafted to advance.

Effectuating the Settlement would immediately extinguish those rights and
inflict irreparable harm. While it would be unlawful for the Department to seek
recoupment against any school based on a BD application resolved under the
Settlement—as the district court correctly concluded, App.543—the Department has
refused to rule out a "hypothetical recoupment proceeding" or other retaliatory
action against listed schools. Defs. Opp. to Joint Motion for Stay at 7, *Sweet v.
Cardona*, No. 3:19-cv-03674 (N.D. Cal. Jan. 27, 2023), Dkt. 362. Summarily
extinguishing schools' rights in pending adjudications would immediately and
irreparably impair the schools' ability to protect their interests.

**2.**    Schools on Exhibit C would also suffer irreparable reputational injury if the Settlement takes effect.  Being publicly branded a presumptive wrongdoer by one's primary federal regulator (App.518) based on undisclosed evidence (or no evidence at all), seriously damages a school's reputation and goodwill, which can "constitute irreparable harm," *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018).  This injury can manifest itself over time in subtle ways, as when community or business partners quietly discontinue their relationships with schools, prospective students look elsewhere for their educations, or employers distance themselves from a school's graduates.  App.520.  Such harm is "self-evident," *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990), but concrete examples are in the record.

In Lincoln's case, for example, partisan activist groups have leveraged Lincoln's mere inclusion on Exhibit C to pressure and criticize the Department for recently renewing its Program Participation Agreement—which is necessary for receipt of Title IV funding—with Lincoln College of Technology.  Dkt. 350-1 at 10-11, *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal. Jan. 13, 2023).[7]  Plaintiffs'

---

[7]  The district court discounted this evidence on the ground that any reputational harm stemmed from *other* purported "law enforcement activity and consumer fraud abuses," App.546, but that is not a fair reading of the evidence.  The lead example cited by the activist groups was the Department's "determin[ation]" of "'strong indicia'" that listed schools had "engaged in 'substantial misconduct' that had either been 'credibly alleged' or 'proven.'"  Dkt. 350-1 at 5, *Sweet v. Cardona*, No. 3:19-
*(Cont'd on next page)*

counsel has also attempted to wield the Department's purported "determination" of wrongdoing as a cudgel to sabotage business opportunities by listed schools. *See* Berardinelli Decl. Ex. A at 1-2 (letter sent by Plaintiffs' counsel and other activist organizations to the University of Arkansas' Board of Trustees, touting Department of Education's "determination" of "strong indicia regarding substantial misconduct" against the University of Phoenix in an effort to block its potential acquisition by an entity affiliated with the University of Arkansas); *see also* App.448 (quoting Eileen Connor). And the government has equated inclusion on Exhibit C with deceptive practices, exemplified by FTC lawsuits against certain listed schools, in actively soliciting new borrower defense applications against all of the listed schools. App.519-20.[8]

---

cv-03674 (N.D. Cal. Jan. 13, 2023). The Department's decision to renew its Program Participation Agreement with Lincoln and other schools is hardly evidence that "the Department sees no stigma arising from Exhibit C," App.546, especially where the Department *still* refuses to rule out the possibility of (unlawful) future recoupment actions against Exhibit C schools.

[8] The district court puzzlingly asserted that the cited post from the FTC's website "does not impugn" schools listed on Exhibit C. App.550. But that post drew a direct line between inclusion on Exhibit C and FTC lawsuits for "allegedly deceptive practices." "Some of the names of the list of schools included in the *Sweet* settlement may look familiar," the post declared—"and they should." App.519. That is because the FTC had already "sued" many of the listed schools "for their allegedly deceptive practices." App.519-20. The post concluded by urging those who had previously received settlement checks to "file your [BD] application." App.520. These statements plainly did not describe Exhibit C schools in a "neutral" manner. App.550.

34

These attacks have had their intended effect. Six months after Exhibit C was released, Lincoln was denied an opportunity to speak with a class at Centennial High School in Nevada specifically because "Lincoln Tech is on the U.S. Department of Ed's list of predatory schools." App.518-19. This concretely demonstrates public perception that Exhibit C is a government-approved list of bad actors. Yet, in the face of this concrete harm, the district court blithely responded that the harm could be "reparable through correction" by maligned schools. App.549. That is wrong on the law, because "correction" is an option whenever reputational harm results, yet reputational harm can be irreparable. *See, e.g.*, *adidas Am., Inc.*, 890 F.3d at 756. It is also wrong to assume that a charm campaign could overcome stonewalling or outright rejection from schools' partners who have already made up their minds. Even if "correction" could mitigate some harm, in many cases the reputational consequences will materialize silently, as community partners simply quietly discontinue their relationships. App.520. In those cases, affected schools may never be able to identify with whom they should engage for "correction." The district court improperly trivialized these harms to schools' programmatic activities and community relationships.

Further, financial partners have altered due diligence and lending patterns because of the Settlement. *See* App.526. Lincoln, a public company, also has described this litigation as a material risk in its securities filings, evidencing harm to

financial reporting and shareholder relations.  App.521.[9]

Effectuating the Settlement would further solidify the Department's arbitrary and unlawful action and would amplify these reputational harms.  It would cause immediate discharges and refunds for borrowers whose BD claims have received no review and, in some cases, bear indicia of material error or worse.  Plaintiffs, for instance, repeatedly have cited a "group" BD application against Lincoln by a state regulator, but at least 12% of individuals in that group had no Title IV loans for attending Lincoln.  App.464.  These errors are a byproduct of the Department's admitted decision not to identify "which borrowers" had applied for BD relief until after it completed Exhibit C.  Decl. of Michael Garry ¶ 6, *Sweet v. Cardona*, No. 3:19-cv-03674 (N.D. Cal. Jan. 30, 2023), Dkt. 363.  If the judgment takes effect, the Department's inflated BD numbers will be irreparably attributed to Appellants, and the publicity campaign against Exhibit C schools will only intensify.

It is therefore no answer that Appellants have "already" experienced irreparable harm.  App.544.  Appellants' ongoing reputational harms are proof that such harm can concretely materialize—and a strong indication that additional harms will materialize with time.  *See, e.g.*, *Reuters*, 903 F.2d at 908.  Effectuating the

---

[9]  The district court erred in equating this distinct harm with stock price, which Lincoln did *not* assert had been harmed.  App.550; *cf. INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 89 (1992) (recognizing the "shareholder-relations expenses a publicly traded corporation incurs, including reporting and disclosure obligations").  In any event, stock price need not go down to be negatively affected by material events.

Settlement would make it more difficult to correct existing misperceptions. Staying the judgment pending appeal, in contrast, would underscore that Exhibit C has no effect and "counteract" any further reputational injury while this Court decides whether to "remove [Appellants] from Exhibit C." App.549-50.

The Settlement also deprives schools of their due process right to contest the badges of wrongdoing the Settlement imposes. *Supra* pp. 27-29. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017).

## IV. A Stay Will Not Impose Irreparable Harm.

**1.** By contrast, a stay would inflict no harm to the settling parties. No class member is paying or accruing interest on any of the loans covered by the Settlement. Nor will that happen during any appeal. The Settlement provides that class members' loans "will remain in forbearance or stopped collection status" until there is Full Settlement Relief. App.233. In any event, there has been a national policy of forbearance on federal student loan payments and zero interest for the last three years. The Administration has made clear that this policy will "continue" even "after the formal end of the" COVID-19 emergency. App.514. There is no conceivable harm to class members from a temporary stay here.

In holding otherwise, the district court uncritically accepted Plaintiffs' vague assertions of intangible harm—*e.g.*, the need to "breathe easier" and "sleep easier,"

App.554-55—that forbearance does not redress. The district court's acceptance of these assertions contrasts with its searching scrutiny of Appellants' evidence of irreparable harm. That approach is especially unjustifiable given Appellants' showing that much of the purportedly "ample evidence" submitted by Plaintiffs was conclusory and not credible. App.554. Plaintiffs, for instance, submitted one declaration from an affiant who inaccurately claimed to have attended Lincoln Tech. When Lincoln challenged that assertion, App.520-21, Plaintiffs were forced to file a corrective declaration, App.529.

The Department would actually *benefit* from a stay. A stay would spare the Department from expending resources carrying out an elaborate and expensive process that could be later reversed. It would thus eliminate the risk that the Department may ultimately need to rescind promises and payments made prematurely to class members. In these circumstances, the federal government, which is duty-bound to protect the public fisc and avoid injuring or confusing class members in the event of a reversal, cannot reasonably maintain that a stay would harm its interests.

**2.** The settling parties' own actions "undercut" any "claim of irreparable harm." *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015). Plaintiffs delayed this action 17 months while they (unsuccessfully) sought an entirely unnecessary deposition of the former Secretary of Education. *See In re U.S. Dep't of Educ.*, 25

38

F.4th 692 (9th Cir. 2022). The district court did not explain why it would be "unfair" (App.554 n.7) to hold Plaintiffs accountable for their own litigation choices. Having delayed once already for an appeal seeking to score a high-profile deposition, Plaintiffs cannot complain that a temporary delay pending appeal would irreparably injure them. The settling parties even *agreed*—prior to intervention—to delay the Settlement's Effective Date and the many actions it triggers until after the final judgment became unappealable or any class-objector appeal was resolved. App.226.

Regardless, the claimed harms cannot withstand scrutiny. The Department, for instance, argued to the district court that it would be injured by a stay given the growing backlog of BD applications. But the government itself procured many of those backlogged claims through its own advertising efforts. App.519-20. And nothing would prevent the Department from continuing to decide BD claims lawfully while this case is appealed.

Recent Supreme Court precedent confirms the propriety of a stay here. In *Nebraska v. Biden*, the Eighth Circuit preliminarily enjoined the Administration's other debt-cancellation program, 52 F.4th 1044 (8th Cir. 2022) (per curiam)—and the Supreme Court left that injunction in place "pending oral argument," *Biden v. Nebraska*, 143 S. Ct. 477 (2022) (Mem.). Notably there (unlike here), the government contended that the debt-cancellation program was necessary "[t]o protect student-loan borrowers affected by a national emergency," Petrs. Br. at 2,

*id.*—yet the Supreme Court still maintained the status quo during appellate review. Here, where there is *no* emergency and the parties have *already agreed* to defer the Settlement's Effective Date during an appeal, there is no plausible claim that awaiting the final resolution of Appellants' appeals would irreparably harm anyone.

### V. The Public Interest Favors A Stay.

A stay would also serve the public interest, which generally is in "maintaining the *status quo* while [an] appeal is pending." *Doe #1*, 957 F.3d at 1068.

Here, a stay would protect this Court's appellate jurisdiction. This case presents several important issues, some of first impression. The Settlement directly affects hundreds of thousands of class members, the 151 schools on Exhibit C, and potentially *every* educational institution in America that will be subjected to the new procedures for the Decision Group and Post-Class Applicants sub-classes. The judgment is also estimated to cost taxpayers $7.5 billion just for the Class (and likely double with the addition of Post-Class Applicants), and will bind the Department for years to come. If the Settlement takes effect, the settling parties may then argue that the Settlement is a *fait accompli* and no longer justiciable; that it is infeasible to reverse what has been done; and that any attempt to do so will cause confusion and more hardship. This case deserves meaningful appellate review, without worry of upsetting reliance interests injected by the settling parties while the appeal was pending. The public, no less than this Court, has a strong interest in safeguarding

this Court's appellate jurisdiction over significant legal questions with broad, class-wide impact.

A stay would also promote the orderly administration of justice. As noted, the Supreme Court is currently considering the lawfulness of the Administration's other debt-cancellation program, and a decision in that case is expected by the end of this Term. *See Dep't of Educ. v. Brown*, No. 22-535 (U.S.); *Biden v. Nebraska*, No. 22-506 (U.S.). The outcome there is likely to have a significant impact here. Appellants, for example, have challenged the Secretary's claimed authority under the major-questions doctrine, *supra* pp. 23-24—the same issue raised in *Nebraska* and *Brown*. Indeed, the government's opening brief in the Supreme Court cited the district court's judgment *here* in arguing against application of that doctrine. *See* Petrs. Br. at 4 n.1, 55, *Nebraska*, No. 22-506. At bottom, the final judgment in this case implicates novel issues that are the subject of fast-moving legal developments in the Supreme Court and political debate, and the public interest lies with permitting meaningful appellate review.

## VI. At A Minimum, The Court Should Grant A Stay As To Appellants.

Finally, if the Court does not believe that the factors favor staying the entire judgment pending appeal, the Court at a minimum should stay the judgment as to the appealing Appellants. Appellants represent less than one percent of the claims included in the automatic relief class. Appellants do not wish to prevent a legitimate

settlement of this case or prevent granting of meritorious BD applications. Appellants simply want what justice demands—their removal from Exhibit C and the assurance that any BD claims against them will be adjudicated fairly and in accordance with law. The merits panel should be permitted to consider these issues without new claims of hardship from reversing a judgment that has already been effectuated as to the Appellants. The Court therefore should at least stay implementation of the Settlement for any class member who attended one of Appellants' schools.

## CONCLUSION

The Court should stay the district court's judgment pending appeal.

Dated: February 27, 2023                    Respectfully submitted,

*/s/ Jesse Panuccio*                        */s/ Lucas C. Townsend*
Jesse Panuccio                              Lucas C. Townsend
Jason Hilborn                               Jeffrey Liu
BOIES SCHILLER & FLEXNER LLP                GIBSON, DUNN & CRUTCHER LLP
401 E. Las Olas Blvd., Ste. 1200            1050 Connecticut Avenue, N.W.
Fort Lauderdale, FL  33301                  Washington, D.C.  20036
(954) 356-0011                              (202) 887-3731
jpanuccio@bsfllp.com                        LTownsend@gibsondunn.com

*Counsel for Everglades College, Inc.*      James L. Zelenay, Jr.
                                            GIBSON, DUNN & CRUTCHER LLP
                                            333 South Grand Avenue
*/s/ John S. Moran*                         Los Angeles, CA  90071
John S. Moran                               (213) 229-7449
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500                Katherine Worden
Black Lives Matter Plaza                    GIBSON, DUNN & CRUTCHER LLP
Washington, D.C. 20006                      555 Mission Street
(202) 828-2817                              San Francisco, CA   94105
jmoran@mcguirewoods.com                     (415) 393-8229

Piper A. Waldron                            *Counsel for Lincoln Educational*
MCGUIREWOODS LLP                            *Services Corp.*
1800 Century Park East, 8th Floor
Los Angeles, CA 90067
(310) 315-8250

*Counsel for American National University*

43

**CERTIFICATE OF COMPLIANCE**

I certify that this brief is accompanied by a motion for leave to file a longer brief pursuant to Circuit Rule 32-2 and is 9,833 words, excluding the portions exempted by Fed. R. App. P. 32(f).

/s/    *Lucas C. Townsend*
Lucas C. Townsend

**CERTIFICATE OF COMPLIANCE**

I hereby certify that on February 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all current participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/     Lucas C. Townsend*
Lucas C. Townsend